MARTHA J. SMITH, APPELLANT, VS. SAMUEL R. CURTIS, APPELLEE.

1. While the act requiring upon an appeal that a true copy of proceedings of the Circuit Court shall be filed with the Clerk of the Supreme Court by the first day of the succeeding term thereof, and that a failure to file the copy makes it the duty of the court, on motion of the adverse party, to dismiss the appeal unless good cause be shown for the omission, the court will determine upon the facts in each case, whether good cause is shown.

2. An appeal may be perfected by complainant or defendant in chancery, from a final decree without giving bond and security or paying the costs of the suit as required in suits at law.

3. Capacity to contract attends the possession of ordinary intelligence, and where the consideration is not shown to be inadequate, the fact that a mutual confidence in business relations, and a general friendship justified by past relations of the parties existed at the time of the contract, is not a ground upon which to set it aside.

Appeal from the Circuit Court for Columbia county.

At the June Term, 1882, the appellee moved to dismiss the appeal.

The grounds of the motion are stated in the opinion.

*C. R. King* for the Motion.

*Geo. P. Raney,* (for *S. L. Niblack*) *contra.*

Opinion on motion to dismiss appeal.

THE CHIEF-JUSTICE delivered the opinion of the court on the motion:

Appeal by complainant from a decree in equity.

Appellee moves to dismiss this appeal upon two grounds:

1. That no copy of the record was filed on or before the first day of the term; and 2, that the appellant, who was complainant in the court below, has not paid the costs which had accrued in the suits up to the time of taking the appeal.

As to the first ground of motion, it is shown that the complainant had been unable to procure from the clerk a copy of the record owing to a difference of opinion between the Clerk of the Circuit Court and herself as to the amount of costs to be paid. As soon as she procured the copy it was filed in this court. It seems that she endeavored to procure the copy in time to file it here but failed for that reason.

While the law is imperative that the appeal must be dismissed if no good cause is shown for the omission, yet the court is the only proper judge as to what constitutes good cause. The delay in this case is sufficiently accounted for. The facts show a purpose to prosecute the appeal in good faith, and the failure to bring up the record was not owing to want of diligence on the part of appellant.

The remaining question is whether a complainant in a suit in chancery must first pay the costs of the suit, as is

required of plaintiffs in suits at law, in order to make the appeal effective.

The "act regulating the mode of suing out writs of error, and prosecuting appeals in the Court of Appeals of the Territory of Florida," approved February 10, 1832, provided that a party might appeal during the term in which judgment, sentence or decree was pronounced, or within ten days thereafter, and that " an appeal obtained shall in all cases operate as a supersedeas." Further, it was provided that the party appealing, "if plaintiff, shall give bond with one or more securities sufficient to cover all the costs which have accrued or may accrue," &c. Thomp. Dig., 446. At that time, and until 1853, (Ch. 521,) final decrees in chancery could be rendered only in term time. An act approved February 11, 1832, entitled " an act to amend an act to regulate proceedings in chancery," provided that " every final decree shall be made and pronounced in open court, and the plaintiff or defendant may appeal from said decree at any time within two years ; *Provided, however*, That the same shall not operate as a *supersedeas* unless the said appeal be taken within the time fixed by law *in . other cases*, or if not taken within that time, upon an order of one of the Judges of the Court of Appeals directing the said appeal to operate as a supersedeas, *in which event* bond and security shall be given as provided for by law."

This act effected a considerable change, as will be perceived, by extending the right of appeal in chancery causes to two years, and providing that an appeal should operate as a supersedeas by giving bond within the time allowed in *other* cases, to-wit: cases at law, or upon the order of a Judge, and giving the bond and security required by law. This act, therefore, recognized the right of appeal from final decrees without giving security, unless a supersedeas was desired. This was expressly so decided in Kilbee &

Barnes vs. Myrick, 12 Fla., 416, and Bauknight vs. Sloan, 17 Fla., 281.

The act referred to (February 11, 1832,) thus made a clear distinction between the taking of appeals in cases at law and cases in chancery. The act of February 10 thereafter had no reference to and did not control appeals in chancery proceedings, but stood only as a rule to be observed when a supersedeas was desired, by force of the act regulating proceedings in chancery and in the cases referred to by the latter. A still further evidence that the law regulating appeals in proceedings at law (the act of February 10, 1832,) does not apply to chancery causes is found in Chapter 521, Laws of 1853, which provides that decrees in chancery may be made in vacation as well as in term time.

We now come to consider the act approved February 12, 1838, "an act to amend 'an act regulating the mode of suing out writs of error and prosecuting appeals in the Territory of Florida,' passed February 8, 1832." This amendatory act referred doubtless to the act of February 10, 1832. Judge Thompson so considered, as in his Digest he has incorporated it with the act of February 10. It has but one section, and reads: " That no appeal or writ of error shall hereafter be granted to the original plaintiff in any suit, unless said plaintiff shall first pay all costs which may have accrued in and about said suit up to the time when said appeal or writ of error is prayed ; and also enter into bond with one or more securities in a sum sufficient to cover all the costs which may accrue in the prosecution of said appeal or writ of error, conditioned to pay the same, if the judgment, sentence or decree of the court shall be affirmed."

This amendatory act was passed four years after the act which provided expressly for the manner of taking appeals in chancery, and which provided another and different

method of, and prescribed other conditions under which they would operate as supersedeas. Equity causes were thus taken out of the operation of the act of February 10, 1832, in respect to appeals by the act of February 11, which prescribed another mode.

Considering then that the Legislature intended to separate and preserve the distinction between the proceedings at law and in equity, the conclusion is that the act of 1836, amendatory of the act of February 10, 1832, was intended to affect only cases at law. From the title of the act its purpose was not to affect chancery causes, it being an act to amend the act of 1832, shorn of its provisions controlling appeals in chancery. True, it speaks of a bond conditioned to pay costs of the appeal or writ of error upon the affirmance of the "judgment, sentence or decree." That was but a repetition of the words of the former law. The word "sentence" commonly signifies the judgment or doom pronounced in criminal cases, but the law assuredly did not intend to embrace such cases; not only was another practice prescribed for them, but an appeal by the *plaintiff* in a criminal case from the sentence of the court would be absurd.

The result in our judgment is, that the act of February 11, 1832, regulated appeals in chancery, and the act of February 10th no longer applied, except as provided in the act of February 11th, to effect a supersedeas; that no bond is required, and the prepayment of costs is not essential to obtain an appeal from a final decree in equity, either by the plaintiff or the defendant.

The motion to dismiss having been denied, the case was submitted on its merits, but not decided till the present term.

The facts of the case are stated in the opinion.

*S. L. Niblack* and *A. B. Hagan* for Appellant.

*C. R. King* for Appellee.

Mr. Justice Westcott delivered the opinion of the court:

The appellant sought through a bill in equity to set aside a deed made by her to Samuel R. Curtis on the ground that it was " improperly and fraudulently obtained," alleging that she was a person of weak mind, and that she was induced to make the deed by undue influence and without consideration. After hearing upon the evidence taken in the cause the Chancellor dismissed the bill, and from this decree plaintiff, Mrs. Smith, appeals to this court.

The question to be determined here is, whether upon the case made by the pleadings and evidence the deed should have been set aside upon the grounds stated.

The testimony of the plaintiff in this case as to the facts and circumstances attending the execution of the deed cannot be accepted as correct. It can serve no good purpose to narrate in detail the manifest inconsistencies and errors in her testimony as to this transaction. It is deemed sufficient to say that they are of such character as prevented the Chancellor from acting upon the hypothesis of their truth.

The immediate circumstances attending its execution are detailed by two witnesses, C. R. King, the attorney who drew the deed, and L. Harrison, the Justice of the Peace who took plaintiff's acknowledgment of its execution. C. R. King swears substantially that Curtis came to his office about the 8th of August, 1878 ; that Curtis stated that Mrs. Smith owed him several hundred dollars and that she wanted to convey the land involved in this suit in part payment of the debt; that there was a mortgage on the place and that she wanted a maintenance or support out of

it; that Curtis directed him to draw a deed of trust and asked him to go over to Mrs. Smith's and see if it would suit her; that he drew the deed and went over to Mrs. Smith's the next day; that she was then living on the place; that he asked her if Curtis had said anything to her about his, King's, drawing some papers for her; that she said he had; that he (K.) read the paper over to her, when she refused to sign, saying it was not the kind of paper she wanted drawn; that she said she wanted to make a deed to the land such an one as would bind him to support her as long as she lived; that having no pen, &c., he told her that she would have to come to town to do that; that when he left he remarked to her that he was in readiness when she came to town to draw such paper as she wanted; that she came to his office, he thinks, the next morning; that after speaking about sales of her town property, she told him she wanted a deed drawn to Curtis to the place he was living upon; that he commenced drawing the deed and got to the part where the consideration should be named; that he asked her what the consideration should be; that she said she did not know; that he asked her what Curtis was to give her for the place; that she said a right smart as she looked at it; that he was going to pay a mortgage and support her as long as she lived, saying that Curtis claimed that she owed him a right smart and he was to give it up; that Curtis then spoke and said he could explain that; that all his earnings for ten years both on and off the place had been expended on the place in support of Mrs. Smith and her family; that he was out between twelve and seventeen hundred dollars; that Mrs. Smith said she knew she owed him a right smart, but did not think it was that much; that if he would pay the mortgage and give her a paper showing that he was to support her, she would give him a deed to the land; that witness asked what considera-

tion should be stated, suggesting various sums, $1,000,
$1,500, $2,000, and finally she said well put it in $1,500,
and he so drew the deed ; that he read the deed over ; that
she seemed to understand it and expressed herself satisfied ;
that we then commenced to talk about the bond and agreed
upon it ; that witness sent Curtis to get a witness to the
deed ; that Harrison, a Justice of the Peace, and himself
witnessed the signature of Mrs. S. to the deed, and the
Justice took her acknowledgment ; that immediately there-
after the bond (which was a bond of Curtis in the sum of
$500 conditioned that Curtis, his heirs, executors and ad-
ministrators " shall and do take, keep and maintain the
said Martha J. Smith with comfortable bed and board and
suitable clothing during her natural life and so long as she
remains a single woman, without stint or fraud,") was read
over to her, she expressed herself satisfied with it and Cur-
tis signed it ; that Harrison and witness witnessed it ; that
Mrs. Smith did not display any irregularity of mind. She
seemed to be cool and collected, exhibiting no excitement.
She has a peculiar way of shaking her head, and to some
extent of the hands ; that he noticed the shaking of her
hands in her signing the paper ; that he has noticed this
from the first time he saw her, some thirteen or fourteen
years ago. After the deed was signed and we were all
about through, the deed was handed to Curtis and the
bond to Mrs. Smith, she remarking, " Well, you must look
to Curtis for pay ;" that before she came out she handed
the bond to Curtis, and that he understood her to say put
it with her papers in the safe at Cline's. This witness
being subsequently recalled stated that he understood there
was a settlement between Mrs. Smith and Mr. Curtis in his
office on the 10th of August, 1878. They came to my
office on that day to have the deed drawn. In discussing
the consideration it was finally agreed that she owed him

either seven or eight hundred dollars. He agreed to pay the mortgage as soon as he could find where it was, and he was to make her a bond for a life maintenance. She stated that her children had all married and gone off, and she had no one to take care of her and that she desired that he should be bound to support her.

The Justice, Harrison, corroborates the statements of King. He says that Mrs. Smith signed the deed in his presence, and that he took her acknowledgment to the effect that she signed the instrument of writing for the purposes therein expressed ; that he did not know it was a deed. The instrument was already written out and Captain King said it was a deed. The bond was read. Mr. Curtis signed it in the presence of Mrs. S. and I witnessed it. Captain King said this is Mrs. Smith's and this is Mr. Curtis'. The papers were lying on the table. Another witness, W. M. Duke, testifies to a conversation had with Mrs. S. in reference to this transaction. He says that Mrs. S. told him that she was going to convey her land to Mr. Curtis and asked him who would be a suitable person to draw the deed ; that he told her that almost any lawyer could draw it; that she then told him that she wanted it fixed so that he would have to give her a support. I told her that she had better get legal advice and referred her to W. M. Ives, to S. L. Niblack and C. R. King ; that she told him her reasons for executing the title. She said that Mr. Curtis had done more for her than any of her children ; that she said nothing about a monied consideration ; that Curtis was not with her ; that from the time she came to him asking his advice about making the deed, to the time when she told him she had made it, was an interval of about one week or ten days. After she executed the title, in the second conversation she expressed herself as being perfectly satisfied now. She said she now had plenty. She spoke of George's

(her son) being away and of some other little troubles; said that he had not treated her like a son should, and she appeared to think that Lilla (her daughter) had acted very badly in marrying a man who was supposed to have a wife somewhere else.

Mrs. Smith and Mr. Curtis also testified as to the circumstances immediately attending the execution of the deed. Mrs. Smith first denies that she ever executed the deed, and denied receiving a bond, or that she knew of its existence until it was shown to her by her counsel afterwards. Subsequently she admits signing the deed. Not only upon this subject, but in reference to other matters, she is positively contradicted by disinterested witnesses, and as to some of them her statements conflict. The Chancellor could have very properly disregarded her testimony in this respect as well as in all other matters where she was not sustained by facts and circumstances otherwise appearing. It would be unpleasant, and as it is unnecessary, we will not enter into any detailed statements of the manifest errors of fact to which she swears.

While neither this testimony nor that embraced in the record discloses the amount of the debt due by Mrs. Smith to Curtis, if indeed any debt is clearly proved, still the agreement to provide for Mrs. S. during her life and as long as she was a widow, which is clearly established and admitted by defendant, was a good legal consideration for the land, and there is nothing in the testimony, so far as it is to be believed as to the execution of the deed, which is not entirely consistent with the utmost good faith upon the part of each of the parties.

It is insisted, however, that this transaction was the result of fraud and undue confidence of Mrs. S. and improper influence of Mr. C., that Mrs. S. was a person of weak mind, and that there was no adequate consideration.

We examine the testimony as to the matter of consideration.

Dr. Hutchinson testifies that he offered $2,000 for the place in 1868, nothing being said in regard to the payments ; that he desired to purchase it to build a hotel, "having faith in the possibility of invalids visiting Lake City, and also for the benefit of the citizens of the town."

The witness, King, valued the place at $600.

W. M. Duke swears that he does not think the rental value of the place would have supported Mrs. Smith and her family. He places the valuation at from $5 to $7 per acre, and says that he does not think the rental value of the place in 1868 was much.

The place consists of 80 acres of land, and is about half under water. There is about 20 acres cleared land. There were two ordinary farm houses. on it. It had a lake view and a spring for bathing, from which a small income of about $37 or $35 per year had been in some years realized. The spring was out of repair and in bad condition.

From this testimony we certainly cannot say that the plaintiff has established such inadequacy of the consideration as would justify a court of equity in setting aside this deed. A part of the consideration here was an agreement to pay a mortgage debt of $150. Taking the highest sum named, $2,000, which was an offer by a physician for a special purpose, the income to be derived from a simple investment of this sum would not have more than sufficed to provide for the wants of Mrs. Smith, and while we do not say that this is in all cases a proper standard by which to determine the question, we still cannot say that a maintenance suitable to her station in life, for her life was not an adequate consideration for the land sold by the plaintiff, and the plaintiff here has certainly not established that it was worth more. In addition to this there is here conflict-

ing evidence upon the question whether Mrs. S. was not at the time of the execution of the deed indebted to him. He swears she was, and she swears she was not.

As to the allegation of imbecility and mental weakness:

Dr. Wm. T. Hutchinson, her family physician for years, testifies substantially that he has known Mrs. Smith since about 1863, and that he would have known it if she had been within the last ten years so imbecile, idiotic or weak-minded that she could not transact business. He says her general health was bad, and that she had a disease of a nervous character resembling palsy, but that he always looked upon her as a woman of ordinary mind, and while she was at times absent-minded he had had business transactions with her, and that he had discerned no " deficiency in her mind."

W. M. Duke, in stating her condition at about the time of the execution of the deed, says: Her health appeared as usual; that he never knew her to be demented, idiotic or imbecile; that she appears to be a woman of very quick conception; that when talking she talks with sense, and her mind holds to the subject; that when talked to she gives attention; that her answers are intelligent and her habits are regular; that her capacity for transacting business is good.

Mrs. Mary Howell testifies that she had known Mrs. S. for some time, and that her mind is as good apparently as any common woman's mind; that her memory was good; that she seemed to have very good judgment, and that while she, Mrs. H., would most likely have known if she had been weak-minded, that she, Mrs. H., never saw any sign of weak-mindedness about her.

Mrs. Mary I. Sheppard testifies that Mrs. Smith's health was generally bad, that she, Mrs. Smith, complained of a disease in her head; that she was not crippled in any way,

but was not able to attend to her household affairs all the time, and that she had been at her, Mrs. S., house when she was very sick.

Mrs. Smith herself says that while she is palsied about her head and shoulders, and sometimes it affects her mind, that she is " capable of 'tending to business all the time." When recalled at a subsequent date she corrects this by saying that she meant that she was able to attend to her household affairs, but not capable of attending to law business. This testimony establishes that Mrs. Smith was at least a woman of ordinary intelligence. It is not required by the law that she should be a woman of extraordinary intelligence, or that she should have capacity to understand legal propositions. From her own statements to the witness, Duke, she not only understood the effect of her contract with Curtis, but she thought it was an advantageous one for herself, and looking at all the facts as shown in this record we agree with her in that conclusion.

The only remaining question to be determined is whether the execution of this deed was, as between the parties, the result of any fraud or the exercise of any undue influence or the violation of any trust or duty by the defendant to the plaintiff.

The testimony discloses that Curtis went to the place in July, 1868, as a boarder; that he was at that time practicing dentistry ; that for some time he was sick ; that on the 12th of October, 1868, he married the eldest daughter of Mrs. Smith, (she having three daughters and one son.) About March, 1869, he, with his wife, left for North Carolina. Mrs. Curtis returned in November, 1869, and he returned in January, 1870. During the period from 1868 to 1874, except one year, Mrs. Smith testifies that she carried on the farm. Mrs. Smith testifies that in the fall of the marriage she loaned Curtis $65. She also testifies to other

advances to him and performed services for him for which he never paid, while the defendant swears that he has paid all that he ever owed her. His wife having died, he, in the latter part of 1874, married Alice, the second daughter of Mrs. Smith, after which he " furnished the provisions generally " and received the revenues from the place. Without going into details, the evidence upon this point is that defendant during the time he had charge of the place was uniformly kind and attentive to the plaintiff and provided for all her wants. She herself testifies that he was attentive to all her wishes and desires. Says Mrs. Sheppard, plaintiff's witness, when speaking of their relations : " He seemed to be kind and attentive to Mrs. Smith. When I was present he seemed to treat her as a son-in-law ought to treat a mother ; that Mrs. Smith seemed to be very much attached to him. I never knew her to oppose him in anything. I believe by her acts that he had great influence over her, and I don't know that she ever opposed him in managing the place." It is unnecessary to say more of the testimony as to this subject than that it discloses a confidence and trust upon the part of Mrs. Smith which was entirely justified by the kind and considerate treatment which she received from Mr. C. He had for years, during the absence of her children, given her a comfortable support, and had shown such attachment to her and such solicitude for her welfare as justified her in believing that if he agreed to take care of her in the future he would do so. The law does not prohibit contracts entered into upon the basis of mutual confidence and friendship.

Thus disposing of all the questions involved in this case, our conclusion is that the judgment must be affirmed.